## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JESSE CHEN, Individually and on Behalf of All Others Similarly Situated,<br><br>               Plaintiff,<br><br>       v.<br><br>SELECT INCOME REIT, DAVID M. BLACKMAN, ADAM D. PORTNOY, DONNA D. FRAICHE, WILLIAM A. LAMKIN, and JEFFREY P. SOMERS,<br><br>               Defendants. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Jesse Chen ("Plaintiff"), on behalf of himself and all others similarly situated, by and through his attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

### NATURE OF THE ACTION

1.      This is a class action brought by Plaintiff on behalf of himself and the other shareholders of Select Income REIT ("SIR" or the "Company"), except Defendants (defined below) and their affiliates, against SIR and the members of SIR's board of trustees (the "Board" or the "Individual Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15.U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Item 1015 of Reg M-A, 17 C.F.R. 229.1015, in connection with the proposed merger (the "Proposed Merger") between SIR and Government Properties Income Trust ("GOV").

2.     On September 14, 2018, the Board caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with the GOV, pursuant to which, SIR shareholders will receive 1.04 newly issued common shares of beneficial interest in the combined post-close entity ("New GOV") in exchange for each share of SIR common stock they own (the "GOV Consideration"). If the Proposed Merger is approved by shareholders, then at least one day prior to its closing SIR shareholders will receive a distribution of the Industrial Logistics Properties Trust ("ILPT") common stock owned by SIR equal to approximately 0.503 ILPT common shares for each SIR share owned (the "ILPT Distribution" and together with the GOV Consideration, the "Merger Consideration"). Once the Proposed Merger is consummated, GOV will change its ticker symbol to "OPI."

3.     On, October 26, 2018, the Board authorized the filing of a materially incomplete and misleading amended registration statement on form S-4 (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act that recommends shareholders vote in favor of the Proposed Merger.

4.     While Defendants are touting the fairness of the Merger Consideration to the Company's shareholders in the Proxy, they have failed to disclose material information that is necessary for shareholders to properly assess the fairness of the Proposed Merger, thereby rendering certain statements in the Proxy incomplete and misleading. Specifically, the Proxy contains materially incomplete and misleading information concerning: (i) critical projected financial information; (ii) the valuation analyses performed by the Company's financial advisor, UBS Securities LLC ("UBS"), in support of its fairness opinions; (iii) the conflicts of interest faced by UBS; and (iv) the background of the Proposed Merger.

5.     It is imperative that the material information omitted from the Proxy is disclosed to the Company's shareholders prior to the forthcoming shareholder vote (the "Shareholder Vote"), so that they can properly exercise their corporate suffrage rights.

6.     For these reasons as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, Rule 14a-9, and Reg M-A. Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Merger and taking any steps to consummate the Proposed Merger unless and until the material information discussed below is disclosed to SIR shareholders, or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331, federal question jurisdiction, as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

8.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each defendant by this Court permissible under traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985).  "[S]o long as a defendant has

minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

9.      Venue is proper in this Court under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District.   Indeed, SIR's common stock trades on the Nasdaq stock exchange, which is headquartered in this District, which renders venue in this District appropriate. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

10.      Plaintiff is, and has been at all relevant times, the owner of SIR common stock and held such stock since prior to the wrongs complained of herein.

11.      Defendant SIR is a REIT organized under Maryland law that owns properties that are primarily net leased to single tenants. SIR maintains its principal executive offices located at Two Newton Place, 255 Washington Street, Suite 300, Newton, Massachusetts 02458. SIR's common stock is listed on the NASDAQ under the ticker symbol "SIR."

12.      Individual Defendant Adam D. Portnoy is a managing trustee of SIR.  Portnoy is also a managing trustee of GOV and ILPT; is the sole trustee, an officer, and the controlling shareholder of ABP Trust, which is the controlling shareholder of RMR Inc.; a managing director, president and chief executive officer of RMR Inc.; and an officer of RMR LLC.

13.      Individual Defendant David M. Blackman is a managing trustee of SIR and is the President, and CEO of the Company. Blackman is also the president and chief executive officer of GOV and, effective January 1, 2019, a GOV managing trustee.

14.      Individual Defendant Donna D. Fraiche is, and has been at all relevant times, a trustee of the Company.

15.    Individual Defendant William A. Lamkin is, and has been at all relevant times, a trustee of the Company.

16.    Individual Defendant Jeffrey P. Somers is, and has been at all relevant times, a trustee of the Company. He is also a trustee of GOV.

17.    The parties identified in ¶¶ 11-16 are collectively referred to as the "Defendants".

## CLASS ACTION ALLEGATIONS

18.    Plaintiff brings this action on his own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all holders of SIR common stock who are being and will be harmed by Defendants' actions described below (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants.

19.    This action is properly maintainable as a class action for the following reasons:

(a)    The Class is so numerous that joinder of all members is impracticable.  As of the close of business on October 1, 2018, SIR had 89,550,528 shares of common stock outstanding held by hundreds to thousands of individuals and entities—the actual number of public shareholders of SIR will be ascertained through discovery;

(b)    The holders of these shares are believed to be geographically dispersed through the United States;

(c)    There are questions of law and fact which are common to the Class and which predominate over questions affecting individual Class members.  The common questions include, *inter alia*, the following:

i.    Whether Defendants have violated Section 14(a) of the Exchange act and/or Rule 14a-9 promulgated thereunder;

      ii.   Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

      iii.   Whether Plaintiff and the other members of the Class would suffer irreparable injury were they required to vote on the Proposed Merger as presently anticipated;

(d)    Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

(e)    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class; and

(f)    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

**I.**    **Background and the Proposed Merger**

20.    SIR, incorporated on December 19, 2011, is a real estate investment trust. The Company is engaged in the ownership of properties that include buildings and leased industrial lands that are primarily net leased to single tenants. As of June 30, 2018, SIR's consolidated portfolio consisted of 367 buildings, leasable land parcels and easements with approximately 45.7 million rentable square feet that were approximately 94.8% leased (based on rentable square feet).

21.     GOV, incorporated on February 17, 2009, is also a real estate investment trust. GOV operates through two segments: ownership of properties that are primarily leased to government tenants and its equity method investment in SIR. The Company's properties are located in areas, including Alabama, Arizona, California, Colorado, District of Columbia, Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Kentucky, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, New Hampshire, New Jersey, and New Mexico. GOV's principal executive offices are also located at Two Newton Place, 255 Washington Street, Suite 300, Newton, Massachusetts 02458. As of the date of the Merger Agreement, GOV owned 24,918,421 shares, or approximately 27.8%, of SIR's outstanding common stock.

22.     ILPT was incorporated on September 15, 2017, when SIR determined to contribute its 226 industrial properties located in Hawaii and 40 additional industrial and logistics properties located in 24 other states to a new wholly owned subsidiary and take that subsidiary public. On January 17, 2018, ILPT completed its initial public offering, in which ILPT issued and sold 20,000,000 ILPT Common Shares. As of June 30, 2018, ILPT owned 267 buildings, leasable land parcels and easements with approximately 28.8 million rentable square feet, including 226 buildings, leasable land parcels and easements with approximately 16.8 million rentable square feet located on the island of Oahu, HI, and 41 buildings with approximately 12.0 million rentable square feet located in 24 other states. As of June 30, 2018, SIR owned 45,000,000 ILPT Common Shares, or approximately 69.2% of the outstanding ILPT Common Shares as of such date.

23.     RMR LLC is the business and property manager of GOV, SIR, and ILPT, and the personnel and various services that each of GOV, SIR and ILPT requires to operate its respective business are provided to it by RMR LLC pursuant to their respective management agreements with

RMR LLC, which have successive 20 year terms. RMR LLC is a majority owned subsidiary of The RMR Group Inc., or RMR Inc., and RMR Inc. is the managing member of RMR LLC.

24.     On September 17, 2018, GOV and SIR issued a joint press release to announce the Proposed Merger stating, in relevant part, as follows:

**Government Properties Income Trust and Select Income REIT Announce Agreement to Merge; Government Properties Income Trust to Change its Name to "Office Properties Income Trust"**

*Eliminates Cross Ownership and Co-Dependence on Financial Results Among Companies*

*Government Properties Income Trust to Sell its 27.8% Ownership in Select Income REIT*

*Select Income REIT to Distribute its 69.2% Ownership in Industrial Logistics Properties Trust to Select Income REIT Shareholders*

*Combined Company Will Have Increased Scale, Enhanced Diversification and a Broader Investment Strategy*

*Joint Conference Call Scheduled for 10:00 a.m. Eastern Time on September 17, 2018*

<u>Newton, MA</u> (September 17, 2018):   Government Properties Income Trust (Nasdaq: GOV) and Select Income REIT (Nasdaq: SIR) today announced that they have entered a definitive agreement to merge which will create a real estate investment trust, or REIT, focused on owning, operating and leasing office buildings primarily leased to single tenants and high credit quality tenants like government entities.

The surviving company in the merger will be GOV and it will change its name to Office Properties Income Trust, or OPI, upon closing the merger. OPI will continue to be managed by the operating subsidiary of The RMR Group Inc. (Nasdaq: RMR). OPI will be listed on the Nasdaq and the ticker symbol "OPI" has been reserved for the company's common shares. On an adjusted basis, OPI will own a portfolio of high quality office buildings with the following characteristics:

·       213 properties containing 30.2 million square feet with undepreciated gross assets of $6.1 billion;

·       66% of OPI's annualized rent paid by tenants that are investment grade rated;

·    Weighted average remaining lease term, by revenue, of 6.1 years;

·    Occupancy of 92%; and

·    Properties diversified across 38 states and the District of Columbia.

Mark Kleifges, GOV's Managing Trustee and Chief Financial Officer, made the following statement about today's announcement:

> "This transaction addresses a number of the challenges that GOV has been facing, including a high dividend payout ratio, a concentration of near term lease expirations and a high tenant concentration. We believe GOV shareholders will benefit from this transaction by having a well covered dividend set to a long term sustainable level, extending and better laddering the lease expiration schedule, increasing scale and enhancing diversification. OPI also plans to sell assets post closing to further strengthen its credit metrics."

David Blackman, SIR's Managing Trustee, President and Chief Executive Officer made the following statement about today's announcement:

> "GOV, SIR and ILPT have complicated ownership structures, with GOV as SIR's largest shareholder and SIR as the controlling shareholder of ILPT. This transaction will eliminate the cross ownership and increase ILPT's public common share float, which may benefit SIR shareholders who receive a distribution of ILPT shares. Further, OPI will have increased scale, greater diversification and a broader investment strategy, which we believe will create a leading national office REIT focused on buildings leased to single tenants and high credit quality tenants like government entities."

The merger will be a stock for stock exchange whereby SIR shareholders will receive 1.04 shares of GOV for each common share of SIR based upon a fixed exchange ratio. Following the merger, GOV and SIR shareholders will own approximately 52% and 48% of OPI, respectively.

As a condition of the merger, GOV will sell all 24.9 million of the common shares it owns in SIR. Also as a condition of the merger, after receiving shareholder approval for the merger and prior to its closing, SIR will distribute as a special dividend all 45 million of the common shares it owns in ILPT to SIR shareholders. ILPT is a REIT that is focused on owning warehouse distribution and e-commerce fulfillment facilities throughout the United States. These actions will eliminate the cross ownership among GOV, SIR and ILPT.

SIR shareholders will receive approximately 0.502 shares of ILPT for every one share owned of SIR. Based upon closing prices on September 14, 2018, SIR shareholders will receive $11.69 per share from the ILPT share distribution and $17.57 per share in GOV for a total of $29.26 per share.

OPI expects to pay an annual dividend between $0.50 and $0.60 per share, which is based upon a target dividend payout ratio of 75% of projected cash available for distribution. There is no plan to change the current dividend at GOV or SIR prior to closing.

OPI expects to sell properties valued at up to $750 million to reduce leverage to a target debt to Adjusted EBITDA ratio of 6.0x to 6.5x within six months of the closing of the merger.

The transaction is expected to close in late 2018 or early 2019, subject to customary closing conditions, including GOV and SIR shareholder approval.

Citigroup Global Markets Inc. is acting as exclusive financial advisor to a special committee of GOV's Board of Trustees comprised of the disinterested Independent Trustees and Sullivan & Worcester LLP is acting as legal advisor to GOV in this transaction. UBS Investment Bank is acting as exclusive financial advisor to a special committee of SIR's Board of Trustees comprised of the disinterested Independent Trustees and Skadden, Arps, Slate, Meagher & Flom LLP is acting as legal advisor to SIR in this transaction.

25.     On October 18, 2018, SIR declared $0.51/share quarterly dividend. On October 29, 2018, SIR announced positive financial results for the third quarter of 2018. SIR increased revenue year-over-year and beat earnings and FFO estimates.

26.     Since the entering into the Merger Agreement, the stock prices of both SIR and GOV have fallen—GOV dropping significantly more than SIR. Accordingly, the implied value of the Merger Consideration has also decreased significantly. The Merger Consideration is inadequate compensation for SIR shares. It is therefore imperative that shareholders receive the material information (discussed in detail below) that Defendants have omitted from the Proxy, which is necessary for shareholders to properly exercise their corporate suffrage rights and cast an

informed vote on the Proposed Merger.

## II.    The Proxy Is Materially Incomplete and Misleading

27.    On October 26, 2018, SIR filed the Proxy with the SEC in connection with the Proposed Merger.  The Proxy solicits the Company's shareholders to vote in favor of the Proposed Merger.  Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.   However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to cast an informed vote regarding Proposed Merger, in violation of Sections 14(a) and 20(a) of the Exchange Act.

28.    First, the Proxy omits critical financial projections, including the unlevered free cash flow projections for both SIR and GOV (the "Cash Flow Projections").  As stated in the Proxy, to perform its Discounted Cash Flow Analysis of SIR, UBS utilized projections for SIR's unlevered free cash flow through calendar year 2021, which were provided by or prepared based upon direct input from SIR management.  Proxy at 121.  And to perform its Discounted Cash Flow Analysis of GOV, UBS utilized projections for GOV's unlevered free cash flow through calendar year 2021, which were provided by or prepared based upon direct input from GOV management. Proxy at 121.  It is indisputable that the Cash Flow Projections were the most important input in UBS's Discounted Cash Flow Analyses—the entire analyses are based upon discounting the Cash Flow Projections to present value.  However, Defendants elected to exclude the Cash Flow Projections from the Proxy, despite the fact that they simultaneously elected to include a purported "summary" of UBS's Discounted Cash Flow Analyses and both companies' projections.

29.    Defendants elected to summarize the projections for both companies on pages 125 and 127 of the Proxy, but they excised and failed to disclose the most important projections—the

Free Cash Flow Projections. The omission of the Free Cash Flow Projections renders the projection tables on pages 125 and 127 of the Proxy incomplete and misleading because, without the Cash Flow Projections, the projection summaries provide a misleading overall valuation picture of both companies. This is caused by significant differences between unlevered free cash flow projections—widely recognized as the most important valuation metric when it comes to valuing a company and its stock—and the EBITDA projections that were included in the Proxy.

30. EBITDA projection metrics *are not sufficient analogs for cash flow projections*. Well settled principles of corporate finance and valuation dictate that the value of companies and their stock should be premised upon the company's projected future cash flows, not projected EBITDA.[1] UBS agrees, as indicated by their use of the Cash Flow Projections—not EBITDA—in performing their Discounted Cash Flow Analyses, and academics and practitioners concur.[2,3,4]

31. There are fundamental differences between unlevered free cash flow and EBITDA. EBITDA is not a sufficient alternative to unlevered free cash flows—as Warren Buffet and other

---

[1]     Pratt, Shannon. "Net Cash Flow: The Preferred Measure of Return." Cost of Capital. 16. ("Occasionally, we find an analyst treating earnings before interest, taxes, depreciation, and amortization (EBITDA) as if it were free cash flow. This error is not a minor matter…").

[2]     "Morningstar's Approach to Equity Analysis and Security Valuation." *The Valuation Handbook: Valuation Techniques from Today's Top Practitioners*. Ed. Rawley Thomas and Benton E. Gup. Hoboken: John Wiley & Sons, 2010. 305. ("We use a discounted cash flow (DCF) approach to arrive at our intrinsic value estimates because it allows us to separate economic reality from accounting-based noise.").

[3]     Copeland, Thomas. *Financial Theory and Corporate Policy*. 3rd ed. 24. ("The main difference between the accounting definition and the economic definition of profit is that the former does not focus on cash flows when they occur, whereas the latter does… Financial managers are frequently misled when they focus on the accounting definition of profit…").

[4]     Brealey, Richard, Stewart Myers, and Franklin Allen. "The Value of Common Stocks." *Principles of Corporate Finance*. 10th ed. New York: McGraw-Hill Irwin, 2011. 80. ("This discounted-cash-flow (DCF) formula for the present value of a stock is just the same as it is for the present value of any other asset. We just discount the cash flows…. Notice that it is *not* correct to say that the value of a share is equal to the sum of the discounted stream of earnings per share.") (emphasis in the original).

financial experts have stated: "References to EBITDA make us shudder. Too many investors focus on earnings before interest, taxes, depreciation, and amortization. That makes sense, only if you think capital expenditures are funded by the tooth fairy."[5] Relying solely on EBITDA to provide a fair summary of a company's financial prospects has numerous pitfalls. EBITDA does not take into account any capital expenditures, working capital requirements, current debt payments, taxes, or other fixed costs that are critical to understand a company's value.[6] As a result of these material differences between EBITDA and unlevered free cash flows, experts recognize unlevered free cash flows as a much more accurate measure when it comes to analyzing the expected performance of a company.

32.     In light of these significant differences between the Cash Flow Projections on the one hand, and the EBITDA figures disclosed in the Proxy, the tables of projections on pages 125 and 127 of the Proxy were materially incomplete and misleading because, by failing to include the Cash Flow Projections, the tables provide a materially incomplete and misleading overall valuation picture of both companies. Simply put, unlevered free cash flow projections are irreplaceable when it comes to fully, fairly, and properly understanding a company's projections and value.

33.     Additionally, the Proxy states that UBS reviewed and utilized pro forma projections for the combined company (the "Pro Forma Projections") including certain estimates of synergies, in the deriving their fairness opinion. These Pro Forma Projections speak squarely to the question that the Company's shareholders must answer in determining whether to vote in favor of the Proposed Merger: is a smaller stake in the combined company more or less valuable than a full

---

[5]     Elizabeth MacDonald, *the Ebitda folly*, FORBES (March 17, 2003), http://www.forbes.com/global/2003/0317/024.html.
[6]     Cody Boyte, *Why EBITDA is Not Cash Flow*, AXIAL FORUM (Nov. 19, 2013), http://www.axial.net/forum/ebitda-cash-flow/

stake in the standalone company?  Without the Pro Forma Projections, Defendants present the Company's shareholders with only a fraction of the equation, rendering them unable to answer this question and assess the fairness of the Proposed Merger.

34.    Furthermore, the Proxy omits the SIR projections that account for the Company's majority ownership interest in ILPT.[7] The only SIR projections provided in the Proxy explicitly exclude ILPT—"*SIR Excluding ILPT Standalone Prospective Financial Information*".  However, in arriving at its fairness opinion, UBS both received and reviewed financial projections accounting for ILPT prepared by SIR management that the SIR special committee directed UBS to utilize for purposes of its analyses. Proxy at 115. Given that a component of the Merger Consideration is the ILPT Distribution, these projections accounting for the value of ILPT are necessary for shareholders to value the Proposed Merger. Moreover, the projections accounting for ILPT were the projections prepared in the ordinary course of business, and therefore, are generally relied upon and viewed as the most accurate representations of the Company's value.

35.    The omission of the Cash Flow Projections, the Pro Forma Projections, and the SIR projections prepared in the normal course of business and accounting for ILPT renders the financial projections included in the Proxy misleading. If a Proxy discloses financial projections and valuation information, such projections must be complete and accurate.  The question here is not the duty to speak, but liability for not having spoken enough.  With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. Accordingly, Defendants have disclosed some of the projections relied upon by UBS, but have omitted the Cash

---

[7]    The Proxy also omits any alternative method for shareholders to determine the value of the ILPT shares they stand to receive.

Flow Projections and the Pro Forma Projections. Thus, their omission renders the projections disclosed on pages 125 and 127 misleading.

36.    Second, with respect to the *Discounted Cash Flow Analysis* prepared by UBS, the Proxy fails to disclose the following key components—in addition to the omission of the Cash Flow Projections—used in their analyses: (i) the inputs and assumptions underlying the calculation of the various discount rate ranges (including the WACC/CAPM components); and (ii) the actual terminal values calculated.

37.    These key inputs are material to SIR shareholders, and their omission renders the summary of the *Discounted Cash Flow Analysis* incomplete and misleading. As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation."   Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…" Id.  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.  This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

Id. at 1577-78.

38.    Without the above-omitted information and the Cash Flow Projections SIR shareholders are misled as to the reasonableness or reliability of the UBS's analyses, and unable to properly assess the fairness of the Proposed Merger.  As such, these material omissions render the summary of the *Discounted Cash Flow Analysis* included in the Proxy misleading.

39.    Additionally, with respect to UBS's *Selected Public Companies* Analyses and *Selected Precedent Transactions Analysis* the Proxy fails to disclose the individual multiples for each company and transaction utilized in the analyses. A fair summary of companies and transactions analyses require the disclosure of the individual multiples for each company and transaction; merely providing the range of values that a banker applied is insufficient, as shareholders are unable to assess whether the banker applied appropriate multiples, or, instead, applied unreasonably low multiples in order to present the Merger Consideration in the most favorable light. Accordingly, the omission of this material information renders the summaries provided in the Proxy misleading.

40.    Third, the Proxy fails to disclose the amount of compensation UBS received for its prior investment banking and financial services provided to SIR. Disclosure of "any compensation received or to be received as a result of the relationship between" a financial advisor and the subject company or its affiliates is required pursuant to 17 C.F.R. § 229.1015(b)(4). Such information is plainly material to SIR shareholders. It is imperative for shareholders to be able to understand what factors might influence the financial advisor's analytical efforts. A financial advisor's own proprietary financial interest in a Proposed Transaction must be carefully considered when assessing how much credence to give its analysis. A reasonable shareholder would want to know what important economic motivations that the advisor, employed by a board to assess the fairness of the transaction to the shareholders, might have. This is especially true when that motivation

could rationally lead the advisor to favor a deal at a less than optimal price, because the procession of a deal was more important to them—given their overall economic interest—than only approving a deal at truly fair price to shareholders.

41.    On page 123 the Proxy states: "In the past, UBS and its affiliates have provided investment banking services to SIR, GOV, ILPT and RMR Inc., and certain of their respective affiliates, unrelated to the proposed transaction, for which UBS and its affiliates have received or will receive compensation, including in the past two years having acted as (i) joint bookrunner on a senior unsecured notes offering of SIR in May 2017, (ii) joint lead arranger on a bridge facility and joint bookrunner on a concurrent follow-on equity offering of GOV in June 2017, (iii) joint bookrunner on an unsecured notes offering of GOV in July 2017, (iv) financial advisor and dealer manager on a rights offering of RMR Real Estate Income Fund, a closed-end management investment company advised by a subsidiary of RMR Inc., in September 2017, (v) joint bookrunner on a credit facility of ILPT in December 2017 and (vi) lead left bookrunner on ILPT's initial public offering in January 2018." Yet, inexplicably, the Proxy fails to disclose the amount of compensation UBS received. The omission of quantified compensation details from UBS's previous work for the Company renders the statement provided on page 123 of the Proxy, and potentially UBS's fairness opinion, materially incomplete and misleading, and in violation of 17 C.F.R. § 229.1015(b)(4).

42.    Fourth, and finally, the Proxy omits material facts from the *Background of the Merger* section, rendering the summary provided therein misleading. Once a Proxy travels down the road of partial disclosure of the history leading up to a merger the duty of disclosure requires Defendants to provide shareholders with an accurate, full, and fair characterization of those historic events. The Proxy discusses the negotiation of the exchange ratio for the GOV Consideration and

the negotiation of the timing of the Secondary Sale and the ILPT Distribution, but fails to discuss the negotiation of the actual ILPT Distribution. As an item with financial value, it presumably was not just given away to SIR shareholders. Thus, the information is material to shareholders who would find it important to know what was bargained for in exchange for the ILPT Distribution.

43.     Additionally, the Proxy fails to disclose the identity of each member of the special committees for both SIR and GOV and those attending meetings described as "independent trustees." The Proxy discloses the identity of the chair of each committee and makes general references to "independent trustees" but fails to disclose the individual identities of each member of each committee. Special committees are created in an attempt to remove as much of the competing interests from a conflicted sales process as possible. Thus, the identity of the members of a special committee is of particular importance to shareholders, so that they can determine whether the conflicts have been neutralized. This is particularly important given the level of conflict between the parties involved in the Proposed Merger. Indeed "independent trustee" Somers—or so he is described in the Proxy—is actually a trustee for GOV as well. Accordingly, the omission of the above background information creates misleading statements provided in the Proxy for SIR shareholders.

44.     In sum, the omission the of the above-referenced information renders statements in the Proxy materially incomplete and misleading in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Merger, Plaintiff and the other members of the Class will be unable to cast a fully-informed vote in favor of the Proposed Merger, and are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**On Behalf of Plaintiff and the Class Against All Defendants for Violations of Section 14(a) of the Exchange Act**

45.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

46.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

47.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

48.     Item 1015 of Regulation M-A requires "[a]ny report, opinion or appraisal relating to the consideration or the fairness of the consideration to be offered to security holders or the fairness of the transaction to the issuer or affiliate or to security holders who are not affiliates" to "[d]escribe any material relationship that existed during the past two years or is mutually understood to be contemplated and any compensation received or to be received as a result of the relationship between: (i) The outside party, its affiliates, and/or unaffiliated representative; and (ii) The subject company or its affiliates." 17 CFR 229.1015

49.     The omission of information from a proxy statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

50.     Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Merger.   Each of the Defendants reviewed and authorized the dissemination of the Proxy and the use of their name in the Proxy, which fails to provide critical information regarding: (i) projected financial information; (ii) the valuation analyses performed by UBS; (iii) the conflicts of interest faced by UBS; and (iv) the background of the Proposed Merger.

51.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.   Each of the Individual Defendants, as officers and/or trustees, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).   The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

52.     Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading.   The Individual Defendants undoubtedly reviewed and relied upon most, if not all, of the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger. Indeed, the Proxy states that Defendants were privy to and had knowledge of the financial projections for SIR and the details surrounding discussions with other interested parties and UBS. Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be

materially incomplete and misleading.  Indeed, the Individual Defendants were required to review UBS's analyses in connection with their receipt of the fairness opinions, question the bankers as to their derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

53.    Each and all of the Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement, the preparation and review of strategic alternatives, and the review of SIR's financial projections.

54.    SIR is also deemed negligent as a result of the Individual Defendants negligence in preparing and reviewing the Proxy.

55.    The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, and will deprive them of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the shareholder vote on the Proposed Merger.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**On Behalf of Plaintiff and the Class Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

56.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

57.     The Individual Defendants acted as controlling persons of SIR within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as trustees of SIR, and participation in and/or awareness of the SIR's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of SIR, including the content and dissemination of the statements that Plaintiff contends are materially incomplete and misleading.

58.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

59.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of SIR, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The omitted information identified above was reviewed by the Board prior to voting on the Proposed Merger.  The Proxy at issue contains the unanimous recommendation of the Board to approve the Proposed Merger.  The Individual Defendants were thus directly involved in the making of the Proxy.

60.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

61.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

62.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

63.    Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands relief in his favor and in favor of the Class and against the Defendants jointly and severally, as follows:

A.  Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.  Preliminarily and/or permanently enjoining Defendants and their counsel, agents, employees, and all persons acting under, in concert with, or for them, from proceeding with,

consummating, or closing the Proposed Merger, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy;

C.   Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

D.   Directing the Defendants to account to Plaintiff and the Class for all damages suffered as a result of their wrongdoing;

E.   Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

F.   Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: November 9, 2018

Respectfully submitted,

*/s/ Juan E. Monteverde*
Juan E. Monteverde

**MONTEVERDE & ASSOCIATES PC**
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel.: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Counsel for Plaintiff*